Kenneth J. AIKEN, Appellant,

v.

UNITED STATES, Appellee.

Nos. 09–CO–0656, 09–CO–0657.

District of Columbia Court of Appeals.

Argued March 3, 2011.

Decided Oct. 20, 2011.

Jonathan W. Anderson, Public Defender Service, with whom James Klein and Jaclyn S. Frankfurt, were on the brief, for appellant.

Elizabeth Gabriel, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Mary B. McCord, and James Sweeney, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and STEADMAN, Senior Judge.

THOMPSON, Associate Judge:

In 2001, appellant Kenneth Aiken was convicted of committing a series of felony and misdemeanor offenses against his former girlfriend, Patricia Parker, in 2000. On appeal to this court, he sought relief from those convictions on a number of grounds, including that his trial counsel provided ineffective assistance by failing to request a so-called *Kastigar*[1] hearing, at which the government would be required to prove that its evidence at trial would not include evidence derived from immunized testimony that appellant gave at a hearing on Parker's petition for a civil protection order ("CPO"). We concluded that appellant had made "a more than colorable showing of deficient performance" by his counsel in failing to request a *Kastigar* hearing, and we held that appellant was entitled to a hearing to determine whether the government had made use of his immunized testimony at trial and, if so, whether the use "was harmless beyond a reasonable doubt in light of the strength of the government's case." *Aiken v. United States (Aiken I )*, 956 A.2d 33, 49–50 (D.C. 2008).

The trial court held the *Kastigar* hearing in December 2008. Afterward, in an April 27, 2009 order ("Order"), the trial court ruled that the government had met its burden of proving that "none of the government's evidence was tainted by [appellant's] CPO testimony." Appellant now appeals from that ruling, arguing that the trial court clearly erred in so finding. We agree with appellant that the government did not meet its burden to prove by a preponderance of the evidence that no use

---

1. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

was made of his immunized testimony. We also conclude that as to three of appellant's convictions—his conviction of an alleged August 22, 2000 felony threat (Count 6) and two of his misdemeanor destruction of property convictions (Counts 8 and 9)—the use made of his immunized testimony was not harmless beyond a reasonable doubt. Accordingly, we conclude that appellant is entitled to reversal of his convictions of those charged offenses.

## I. Procedural History and Background

This case arose from a series of threats, harassing telephone calls, and assaults allegedly committed by appellant against Parker beginning in March 2000. On September 26, 2000, a hearing was held on Parker's request for a CPO. At the conclusion of the CPO hearing, at which both appellant and Parker testified, the trial court issued a CPO directing appellant to stay away from Parker.

In December 2000, appellant was indicted for escape from a halfway house, and on January 3, 2001, he was charged in a separate 15-count indictment with numerous offenses against Parker (including some that were committed after issuance of the CPO).[2] The cases were joined for trial. On January 30, 2001, a jury found appellant guilty of felony threats (three counts), felony destruction of property, stalking, and simple assault. The court found appellant guilty of simple assault, five counts of misdemeanor destruction of property, and two counts of violating a protective

order. Appellant was sentenced to an aggregate term of 14 years of imprisonment.

There followed appellant's direct appeal, his D.C.Code § 23–110 motion alleging ineffective assistance of counsel, his appeal from the trial court's denial of that motion, and this court's decision in *Aiken I* remanding for the *Kastigar* hearing. In its Order issued on April 27, 2009 (as amended *nunc pro tunc* on May 19, 2009), the trial court found that appellant's immunized testimony "was not used to refresh memories, focus thoughts, organize testimony, or alter witnesses' statements," was "not used for non-evidentiary purposes such as focusing an investigation, refusing to plea bargain, interpreting evidence, planning trial strategy, or planning cross-examination," and "did not alter, shape, or affect witness testimony or [appellant's] prosecution."

In his appeal from that Order, appellant asserts that the government failed to prove that the prosecution of his case was not tainted by the police detective's and the prosecutor's exposure to (or exposure to information about) his immunized testimony. He also argues that the evidence the government presented at trial—primarily through the testimony of Parker, who heard his testimony at the CPO hearing—contained new facts, details, and explanations that were prompted by that immunized testimony and that "added depth to [Parker's] story," "significantly strengthened the credibility of her allegations," ascribed a motive to appellant for one of the alleged offenses, and bolstered

**2.** Specifically, appellant was charged with one count of assault on March 11, 2000; three counts of felony threats on March 13, August 22, and October 2, 2000; stalking between August 2000 and October 2000; five counts of misdemeanor destruction of property, including two counts on August 21 and one count each on August 25, August 26, and August 27, 2000; one count of felony destruc-

tion of property on September 3, 2000; two counts of violation of a protective order on September 27 and October 2, 2000; and one count each of aggravated assault and assault with a dangerous weapon on October 2, 2000.

Appellant admitted to escape and to violating the protective order, but denied the other charges.

the testimony of the government's witnesses by pre-empting defense challenges to their credibility. He contends that he was prejudiced by these impermissible uses of his immunized testimony (which, he asserts, would have been excluded had his counsel provided effective representation and requested a pre-trial *Kastigar* hearing) and that he therefore is entitled to reversal of his convictions.

## II. Applicable Law

■ We begin with a discussion of the law that guides our analysis. At the time of the CPO hearing, D.C.Code § 16–1002(c) provided in pertinent part that "[t]estimony of the respondent in any civil proceeding under this subchapter [including a CPO hearing] and the fruits of that testimony shall be inadmissible as evidence in a criminal trial except in a prosecution for perjury or false statement."[3] In *Aiken I*, we reasoned that even though § 16–1002(c) did not compel testimony by the respondent in a CPO proceeding, its purpose was "to enable (if not to compel) witnesses to testify (in CPO hearings) without losing, in effect, the benefits of the privilege against self-incrimination." 956 A.2d at 44. We noted that in *Kastigar*, the Supreme Court held that where a statutory grant of immunity affords a protection "coextensive" with the protection furnished by the Fifth Amendment privilege against self-incrimination, it "imposes on the prosecution the affirmative duty to prove that the evidence it propose[s] to use is derived from a legitimate source wholly independent of [a defendant's] compelled testimony." *Kastigar*, 406 U.S. at 453, 460, 92 S.Ct. 1653; *see Aiken I*, 956 A.2d at 44. We held that the government bore the same burden under § 16–1002(c)—i.e., that the government had the burden of proving that it did not make direct or derivative use of a defendant's immunized testimony by "demonstrat[ing] that it obtained all of the evidence it ... use[d] from sources independent of the compelled testimony." *Aiken I*, 956 A.2d at 45 (quoting *United States v. North* (*North I* ), 910 F.2d 843, 854 (D.C.Cir.1990)) (internal quotation marks omitted).

As we noted in *Aiken I*, "[m]ost courts following *Kastigar* have imposed a 'preponderance of the evidence' evidentiary burden on the government." 956 A.2d at 45 (citation and internal quotation marks omitted).[4] This is a "heavy" burden, *Kastigar*, 406 U.S. at 461, 92 S.Ct. 1653, because of the "difficulty of proving a negative." *Aiken I*, 956 A.2d at 45 n. 39. Nevertheless, the government is not required to "negat[e] ... all abstract possibility of taint." *United States v. Schmidgall*, 25 F.3d 1523, 1529 (11th Cir.1994).

■ The "total prohibition on use" of an individual's immunized testimony described in both *Kastigar* and *Aiken I* af-

---

**3.** In 2009, the Council of the District of Columbia amended the D.C.Code to prohibit only the direct evidentiary use of a respondent's immunized CPO testimony, removing the prohibition on using the fruits of that testimony. D.C.Code § 16–1002 (2009) ("Testimony of the respondent in any civil proceedings under this subchapter shall be inadmissible as evidence in a criminal trial or delinquency proceeding except in a prosecution for perjury or false statement."). As neither party argues that the amended § 16–1002 should apply retroactively, we proceed by analyzing the issues presented under the law as it existed at the time of the CPO hearing.

**4.** *See also, e.g., United States v. Slough,* 641 F.3d 544, 550 (D.C.Cir.2011) ("In building a case against a defendant who received use immunity for his statements, the government must prove, by a preponderance of the evidence, that all of the evidence it proposes to use was derived from legitimate independent sources.") (citation and internal quotation marks omitted).

fords "very substantial protection," since it "bars the use of such testimony 'as an investigatory lead,' and also bars 'the use of any evidence obtained by focusing investigation on a witness as a result of' such testimony." *Aiken I*, 956 A.2d at 45 (quoting *Kastigar*, 406 U.S. at 460, 92 S.Ct. 1653). Courts have held that to prove that its investigation was unaffected by a defendant's immunized testimony, the government must "document[ ] or account[ ] for" "[e]ach step of the investigative chain by which the evidence presented was obtained." *United States v. Hampton*, 775 F.2d 1479, 1490 (11th Cir.1985).

■ Further, a prohibited use of immunized testimony occurs "if a witness's recollection is refreshed by exposure to the defendant's immunized testimony, or if his testimony is in any way shaped, altered, or affected" by such exposure, "even where the witness testifies from personal knowledge," and "regardless of the prosecutor's fault." *Aiken I*, 956 A.2d at 45 (quoting *United States v. Poindexter*, 951 F.2d 369, 373 (D.C.Cir.1991), and *United States v. North* (*North II*), 920 F.2d 940, 942 (D.C.Cir.1990) (other citations and internal quotation marks omitted)). A witness's testimony also must be excluded if it "was motivated by" exposure to the immunized testimony. *North II*, 920 F.2d at 942 (internal quotation marks omitted and emphasis removed) ("[E]ven where the witness testifies from personal knowledge, use within the meaning of *Kastigar* may occur ... if the immunized testimony influenced the witness' decision to testify."); *see also United States v. Hylton*, 294 F.3d 130, 134 (D.C.Cir.2002) (noting that "if Hylton's statements were a cause of Wright's decision to plead and testify against Hylton, Wright's testimony was impermissible").

■ The failure of the government to meet its burden under *Kastigar* "can have most drastic consequences," including entitling the defendant to a new trial. *Aiken I*, 956 A.2d at 46 (citations and internal quotation marks omitted). However, even if immunized testimony was impermissibly used, "vacation of the conviction is not necessary where the use is found to be harmless beyond a reasonable doubt." *North I*, 910 F.2d at 854; *see also Schmidgall*, 25 F.3d at 1529 (explaining that a conviction "may be upheld on a finding that the use of such tainted evidence was harmless beyond a reasonable doubt").

In reviewing a trial court's ruling as to whether the government met its burden under *Kastigar*, we review the court's legal conclusions *de novo*, but the trial court's "determination that the government has carried its burden of showing independent sources is a factual finding that is subject to review under the 'clearly erroneous' standard." *North I*, 910 F.2d at 855; *see also United States v. Nanni*, 59 F.3d 1425, 1433 (2d Cir.1995) ("Whether the government made use of immunized testimony, and, if it did, whether it would have taken the same steps entirely apart from the motivating effect of the immunized testimony, are questions of fact, and the district court's findings on those questions will be affirmed unless they are clearly erroneous.").

### III. Analysis

Recognizing the government's heavy burden, we stated in *Aiken I* that "[t]he government's ability to surmount such a difficult obstacle in this case" was "doubtful." 956 A.2d at 41–42. Appellant contends that government has not surmounted that obstacle; we agree that it has not fully done so.

### A. The Investigation and Prosecution

■ Appellant emphasizes that *Kastigar* requires the government to show "that

prosecuting officials and their agents were aware of the immunity problem and followed reliable procedures for segregating the immunized testimony and its fruits from officials pursuing any subsequent investigations." *Hampton*, 775 F.2d at 1490 (citations and internal quotation marks omitted). Appellant asserts that in this case, the government did not make the required showing as to the investigation and the prosecution of his criminal case because the record from the *Kastigar* hearing makes clear that the government did not follow reliable procedures to separate the immunized testimony from subsequent investigation and trial preparation. We are constrained to agree.

At the *Kastigar* hearing, the government presented the testimony of Detective Pamela Herndon[5] and former Assistant United States Attorney Pamela Satterfield, the trial prosecutor. The evidence showed that Herndon, who was the lead investigator assigned to appellant's case, attended the CPO hearing and thus was exposed to appellant's immunized testimony. The government therefore was required to account for each step of the investigative chain in order to prove that Herndon's dealings with witnesses and other investigative tasks were unaffected by the immunized testimony. *See Hampton*, 775 F.2d at 1490. Since it appeared that her investigatory activities "could have been motivated by both tainted and independent factors," the government needed to show that it "would have taken the same steps entirely apart from the motivating effect of the immunized testimony." *Nanni*, 59 F.3d at 1432 (citations and internal quotation marks omitted).

Although Herndon acknowledged at the *Kastigar* hearing that she attended the CPO hearing, she had no actual "recollection of ... attending" it and testified that she did not remember anything from the hearing, including appellant's testimony. She denied attending the hearing to "gather information to use against [appellant]," and stated that she "went there to support the complainant." She testified, however, that she did not "remember Patricia Parker independently" and did not recognize the name of witness David Brox (whose testimony is discussed *infra*). Herndon said that she did not maintain a record of the dates and sources of evidence aside from the notes she recorded in the Metropolitan Police Department database. She could not remember how much work she did on appellant's case after the CPO hearing, but testified that she was "sure" she had conversations with government witnesses other than Parker after the CPO hearing.[6] Herndon testified that she was not aware that there was anything problematic about her listening to appellant's immunized testimony or using what she learned at the CPO hearing, that she could not recall whether she had received any training or instructions to suggest that she was prohibited in any way from using any information she had learned, and that she took no special steps to ensure that she did not use the immunized testimony. When asked whether "anything that happened in that hearing affect[ed] ... [her] investigation or participation in the prosecution of [appellant]," Herndon replied "[n]o."

 The trial court credited Herndon's testimony (and that of the other government witnesses) as "truthful." However,

---

5. At the time of trial, the detective went by the name Montague; at the time of the *Kastigar* hearing, she went by the name "Herndon," the name by which we refer to her.

6. At appellant's trial, Herndon testified that she conducted the bulk of her investigation prior to the CPO hearing, but also testified that she had "been pretty much involved with the case up until now."

given this record, we cannot accept the court's finding that Herndon did not "alter her investigation based on [appellant's] testimony." As the government concedes, and as we stated in *Aiken*, "[a] government agent's denials that [she] made use of the immunized testimony, standing alone, are generally insufficient to meet the government's burden." 956 A.2d at 49 (citation omitted).[7] We do not gainsay the trial court's determination that Herndon "credibly testified" that appellant's CPO testimony had no effect on her investigation of the case, but the issue was not the sincerity of Herndon's belief; it was instead whether the government proved by a preponderance of evidence, beyond Herndon's "denials ... standing alone," *Aiken*, 956 A.2d at 49, that she made no use of the immunized testimony. The government was required to "point to some other evidence to corroborate" Herndon's testimony that she did not use the immunized testimony. *Schmidgall*, 25 F.3d at 1529.[8] We agree with appellant that the government did not meet that burden. We also agree with appellant that given that Herndon was the lead investigator and that David Brox was an important eyewitness,

"there is more than a reasonable possibility that one of the witnesses she spoke to after the CPO hearing was Brox."

■ We reach a similar conclusion regarding appellant's claim that the government failed to prove that the prosecution was not tainted by at least indirect exposure to his immunized testimony. At the *Kastigar* hearing, Prosecutor Satterfield testified that she first interviewed Parker on September 28, 2000 (two days after the CPO hearing), shortly before Parker testified in the grand jury on that day. At the time she interviewed Parker, Satterfield knew there had been a CPO hearing. However, she did not recall whether she discussed the hearing with Parker or asked Parker about her own or any other witness's testimony. Satterfield testified that she never read the transcript of appellant's CPO hearing testimony, that neither Herndon nor anyone else had informed her of the substance of appellant's testimony, and that she was not aware of the content of appellant's testimony. Satterfield also testified that she was "very aware of the statute that says you are not allowed to use the respondent's testimony

7. *See also Hampton*, 775 F.2d at 1487 ("Obviously, the government's conclusory denials of direct or derivative use are insufficient even to negate taint, much less to carry the government's affirmative burden of tracing all evidence presented to wholly independent sources.") (citation and internal quotation marks omitted).

8. In *Schmidgall*, the government had general knowledge of the appellant's involvement in the charged conspiracy, but the appellant provided the government with an immunized statement that provided "details ... that previously had not been disclosed." *Schmidgall*, 25 F.3d at 1526. An agent who was initially one of the lead investigators was not present when Schmidgall gave his statement, but a colleague provided him with a copy of notes from the debriefing. *Id.* The agent had "no idea that the information in the notes was protected by immunity," but testified that he

only once "'briefly perused' the notes and then filed them away," never reading them again. *Id.* The agent continued to investigate the case, however, including speaking to a key witness against the appellant. *Id.* at 1526–27. The agent testified that he "garner[ed] no substantive information" from the notes, and "[f]or each fact ... testified that the source was wholly independent from any immunized statement of Schmidgall." *Id.* at 1527. On that record, the Eleventh Circuit was "unable to sustain the finding that the government met its burden of proving that [the agent] did not use the notes of the immunized ... interview." *Id.* at 1530. The court reached its conclusion because the agent did not have corroborative evidence to "show that the questioning of ... witnesses was not influenced by" his exposure to the appellant's immunized statements. *Id.* at 1529.

in a CPO hearing," and that she was "very careful not to ask any questions about that." Satterfield said that she "pretty much put blinders on when it came to the defendant's testimony in that CPO hearing," and that she believed that she probably warned Parker and Herndon not to tell her anything about the hearing.

However—not having met Parker until September 28—Satterfield did not attempt to "can"[9] or in any way record Parker's proffered testimony prior to the September 26 CPO hearing. Furthermore, on cross-examination, Satterfield acknowledged that she may have requested some information about the CPO hearing from the Assistant Attorney General who had handled the CPO hearing, Kristen Hansen. Although Satterfield could not remember speaking to Hansen, a fax cover sheet that Hansen sent to Satterfield on January 8, 2001 (thus, prior to appellant's trial), noted that "[u]nder *Cruz–Foster*,[10] ... Judge Davis [who presided at the CPO hearing] did hear testimony about the afternoon of August 21 (i.e., dead rat on door)." Satterfield admitted that Hansen's statement appeared to be "in response to [Satterfield's] asking [Hansen] for something."[11] Moreover, Satterfield estimated that she had handled hundreds of criminal trials, and she agreed that it is "[s]ometimes"

difficult to "remember the specifics of one particular case from eight years ago."

In concluding that the prosecution was untainted, the trial court credited Satterfield's testimony that she was not directly informed of appellant's testimony. Again, however, "[a] government agent's denials that [she] made use of the immunized testimony, standing alone, are generally insufficient to meet the government's burden." *Aiken I*, 956 A.2d at 49; *see also North II*, 920 F.2d at 942 ("It simply does not follow that insulating prosecutors from exposure automatically proves that immunized testimony was not used against the defendant."). In addition, it is clear from the record that even just a few years after appellant's trial, Satterfield did not have accurate recall about whether she had learned anything about what transpired at the CPO hearing. Recognizing that the prosecutor's prohibited use of appellant's immunized testimony "could conceivably include ... planning cross-examination, and otherwise generally planning trial strategy," *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir.1973), and that, as appellant argues, "the prosecutor's unwitting exposure [to information about appellant's testimony at the CPO hearing] may have ... [led] her to ask certain questions during her examination of the witnesses,"[12] we must agree with appellant

---

9. This term is derived from *North I*, in which the D.C. Circuit stated that the government's burden of showing by a preponderance of the evidence that it made "no use whatsoever" of immunized testimony in questioning a witness could be met "by establishing ... that the allegedly tainted testimony contains no evidence not 'canned' by the prosecution before such exposure occurred." 910 F.2d at 872.

10. *Cruz–Foster v. Foster*, 597 A.2d 927 (D.C. 1991) (stating that "a defendant's past conduct is important evidence—perhaps the most important—in predicting his probable future conduct").

11. This admission conflicted with the statement Satterfield had made in a 2004 affidavit statement (prepared in response to the filing of appellant's § 23–110 motion) that she had never spoken to anyone about what happened at the CPO hearing. Satterfield explained that at the time she executed the affidavit, she had not reviewed the trial file and had failed to recall the communication from Hansen. The trial judge credited Satterfield's testimony.

12. The government surely overstates the case when it argues that "[b]ecause the prosecutor was unaware of the content of appellant's CPO testimony, her questions could not have been influenced by it."

that the government failed to prove that the prosecution was in no way affected by and made no indirect use of his immunized testimony. *Cf. United States v. Cozzi*, 613 F.3d 725, 730 (7th Cir.2010) (assuming for purposes of appeal that immunized testimony was used since the government had taken no steps to ensure non-use).

Our conclusion about the government's failure to prove that it made no use of the immunized testimony in the investigation or prosecution does not end our discussion, however. We still must consider whether the government's presumed use of the immunized testimony, though impermissible, was "harmless beyond a reasonable doubt in light of the strength of the government's case against appellant." *Aiken I*, 956 A.2d at 50.[13]

In cases where the immunized testimony contained incriminating information, courts have found it impossible, without "canning," to conclude that the investigator's or prosecution's exposure to the statements did not provide investigatory leads or shape the trial preparation or presentation of evidence in a way that was materially prejudicial to the defendant. However, as the trial court in this case recognized, this case "is a far cry from the situation" in *North I* and *North II* and similar cases cited above, "where government witnesses were exposed to incriminating immunized testimony[,] making it difficult to determine whether exposure to the immunized testimony may have affected their testimony." Here, by contrast, appellant's CPO hearing testimony was limited in scope and length (it covered just over twenty tran-

script pages); he denied all of Parker's allegations of assault, stalking, and threats; and he made no inculpatory statements.[14] To put it as the trial court did, appellant's testimony was "not helpful to the government, was inconsistent with the government's evidence, and did not lead to the discovery of any evidence against [appellant]." *Cf. United States v. Anderson*, 450 A.2d 446, 451, 452–53 (D.C.1982) (reasoning that where a defendant had fully confessed his criminal activity to the state grand jury, it was reasonable to assume that the testimony might have been "used" indirectly in focusing the state's investigation, deciding to prosecute, or in planning trial strategy, such as cross-examination, but that "[n]o such assumption is possible in this case because appellee's testimony is devoid of any helpful or incriminating evidence"); *United States v. Caporale*, 806 F.2d 1487, 1518–19 (11th Cir.1986) (reasoning that although the prosecutor had read the immunized testimony before filing the indictment, the issue was "whether he used the testimony in any way to build a case against the defendant," and concluding that since the immunized testimony was "self-serving and of no real value in the subsequent investigation," there was no *Kastigar* violation).

We also agree with the trial court's observation, made at the outset of the *Kastigar* hearing, that "investigation" may not be "a good term in this kind of a case" (meaning, we assume, that the extent of post-immunized-testimony investigation required in this domestic violence case was limited). *Cf. Anderson*, 450 A.2d at 452 (reasoning that it was clear that "the com-

---

13. This is an exacting standard; to meet it, the government must show "that there is no reasonable possibility that the evidence complained of might have contributed to the conviction." *Ellis v. United States*, 941 A.2d 1042, 1049 (D.C.2008) (citation and internal quotation marks omitted).

14. The government is correct that (aside from his denials that he assaulted, threatened, or stalked Parker), appellant's CPO testimony statements "had only marginal, if any, significance to the question of appellant's guilt of any of the charged offenses."

pelled testimony did not cause the investigation to focus on appellee because appellee had always been the subject and focus of the investigation"). As the government argued at the *Kastigar* hearing, there is in this case little basis for concluding that the government went in "a new [investigative] direction based on anything that happened at the CPO hearing."[15]

As appellant appears to recognize, the real issue here is whether Herndon's or Parker's discussions with Satterfield may have been shaped or affected by their memory of appellant's immunized testimony or by anything they remembered or focused on because of the testimony—discussions that may have affected Satterfield's questioning of Parker or other witnesses, or Satterfield's preparation of trial exhibits. We conclude that to discern whether the government's presumed use of appellant's immunized testimony was harmless beyond a reasonable doubt, we must focus—as appellant does[16]—on how the immunized testimony may have shaped or affected the evidence the government presented at trial.

### B. The Trial Testimony Compared to the CPO Hearing Testimony

In *Aiken I*, we instructed that on remand, "the government would have to prove that any changes in Parker's testi-

mony were independent of her exposure to appellant's immunized testimony." 956 A.2d at 50 n. 68.[17] We also said that the government would have to show that Parker's "later testimony was not affected . . . subtly, but nonetheless materially, by her reaction to what [appellant] said" at the CPO hearing. *Id.* at 50. Appellant's brief focuses not only on the trial testimony of Parker, but also on the trial testimony of appellant's cousin, David Brox (who began living in Parker's apartment during August 2000, and who testified with regard to two of the property destruction charges).

Regarding Parker, following the *Kastigar* hearing, appellant filed a memorandum arguing that the government had (1) failed to prove that his CPO testimony did not motivate Parker's trial testimony and (2) failed to prove that his immunized testimony did not influence Parker's trial testimony about several matters, including the circumstances of the alleged March 11 assault, why Parker did not appear for the first scheduled trial on that alleged assault, the alleged March 13 threat, and the August 22 threat. Appellant asserted that Parker "included a number of additional details" about these incidents in her trial testimony that she did not include in her CPO hearing testimony, and that she did not disclose the true nature of her relationship with appellant until after she had

---

**15.** We note also that this court has rejected the notion that a *Kastigar* analysis requires an inquiry into the prosecution's subjective motivation in continuing the investigation after exposure to immunized testimony. *See Anderson,* 450 A.2d at 451 (stating that "an inquiry into the subjective thinking of the prosecuting authorities would be especially meaningless," and observing that "prosecutorial motives are not probative of whether the evidence sought to be introduced was obtained from a legitimate independent source or whether the compelled testimony was used as an investigative lead or that it focused the investigation" on the defendant).

**16.** That focus led appellant to conclude his brief by asserting that, "[a]t a minimum," the testimony of Parker and Brox should have been excluded.

**17.** *See also Hampton,* 775 F.2d at 1488 (requiring the government "to establish an independent source for *each and every item of evidence* which may have been considered") (emphasis added); *North I,* 910 F.2d at 872 (stating that if necessary, such an inquiry "must proceed . . . line-by-line.").

heard appellant's immunized testimony. He renews those arguments on appeal.

### 1. Parker's motivation to testify.

 During his testimony at the CPO hearing, appellant described Parker as a "crack head" and testified that she and appellant had "smoked crack" together. Appellant also claimed that Parker had left him with her children "while she went out and sold her body." He asserted that Parker was jealous of his dealings with other women, "has nothing but anger for me and hate," and was "vindictive" and would do "[a]nything to get [him] to do time." Appellant accused Parker of having "cried wolf before," questioning why she had not previously tried to obtain a protection order, and suggesting that Parker wanted to "control" appellant by having him locked up.

By the time of the *Kastigar* hearing, Parker had died (of cancer) and thus the government could not present testimony from her about the effect of appellant's CPO hearing testimony on her or on her reasons for testifying at trial. Appellant urges us to hold that without Parker's testimony, the government could not meet its burden of proving that his immunized testimony did not motivate Parker to testify at trial. We decline to adopt such a *per se* rule.[18] Quite the contrary, we are satisfied that the trial court did not clearly err in finding, and did not err as a matter of law in concluding that the government met its burden of proving, that appellant's CPO testimony did not motivate Parker to testify against him during the criminal proceedings.

In addition to Herndon and Satterfield, the other witness who testified at the *Kastigar* hearing was Deardre Smith–McGuire, who was employed by the U.S. Attorney's Office and who was Parker's "victim/witness advocate" and worked with her throughout the duration of the case. Smith–McGuire memorialized her interactions with Parker on a "Victim/Survivor Intake Form," which was admitted at the hearing.[19] The intake form describes the

---

**18.** In *Aiken I*, a division of this court noted that Parker was not examined "about the influence on her of appellant's immunized testimony," 956 A.2d at 50, but we made this comment in the context of explaining that the general consistency between Parker's trial testimony and the testimony she gave at the CPO hearing before exposure to appellant's immunized testimony did not prove that Parker's "later testimony was not affected ... subtly, but nonetheless materially, by her reaction to what [appellant] said" at the CPO hearing. *Id*. The division's observation did not purport to be a ruling that, absent an examination of Parker at the *Kastigar* hearing, the government would be unable to show that appellant's immunized testimony was not what motivated to Parker to testify during the criminal proceeding. (As the trial court correctly interpreted, the *Aiken I* court was not discussing "whether the witness' testimony was motivated but whether the *content* of the witness' testimony was motivated" by having heard appellant's CPO testimony (emphasis added)).

We agree that Parker likely knew best the impact that hearing appellant's immunized testimony had on her thinking and her motivation to testify at trial, but the government was not required to prove beyond a reasonable doubt that she was not motivated by appellant's immunized testimony. This means that the government was not required to negate any possibility of such motivational taint. *Schmidgall*, 25 F.3d at 1529 ("Negation of all abstract possibility of taint is not necessary."); *cf. Blaize v. United States*, 21 A.3d 78, 82 (D.C.2011) (reiterating the long-standing principle that to prove guilt beyond a reasonable doubt, the most stringent burden of proof, "the government is not required to negate every possible inference of innocence").

**19.** Smith–McGuire testified that she spoke with Parker by telephone on September 27 about the CPO hearing, but did not recall if Parker told her that appellant had testified. Smith–McGuire further testified that she had no memory of ever learning from any source the content of appellant's CPO hearing testi-

various incidents of threats and destruction of property that Parker reported to Smith–McGuire between March and October 2000. An August 21, 2000 entry notes that Parker was "concerned b/c her criminal case was dismissed—wants to know why & to have it re-brought." Attached to the intake form was an August 24, 2000 email from Smith–McGuire to the assigned prosecutor. In the email, Smith–McGuire noted that the March 11 assault case had been dismissed for want of prosecution. She noted that Parker was "upset" when she found out the case had been dismissed. The email also stated that Parker was "keeping a log book of everything" and was "totally on top of this." [20]

Smith–McGuire testified that Parker was in repeated contact with her. A "Subsequent Contacts Form" admitted into evidence showed that between August 21 and September 20, 2000, Parker called or spoke with Smith–McGuire at least seventeen times to discuss the case. Parker expressed frustration about appellant's continuing to elude the police and provided Smith–McGuire with information regarding potential witnesses.

In addition, as the trial court noted, Parker went to the "extraordinary effort" of posting "wanted" pictures of appellant (almost 300 copies, she estimated) in public areas "to help facilitate his arrest." Parker gave Smith–McGuire a few copies of her wanted poster to give to the U.S. Marshal to help in apprehending appellant. Smith–McGuire observed that Parker "stood out from a lot of the other women I worked with in just her strength and her determination."

If the pre-CPO hearing events were not enough to cause Parker to testify, the

post-CPO events appear to have provided any additional needed incentive. Parker testified at trial that on October 2, 2000, appellant hit her in the face with his fist and beat and stomped her in front of her young children, fracturing her facial bone. She testified that appellant also "chase[d] one of [Parker's children] when [the child] ran to get help." Appellant acknowledged that he hit Parker repeatedly on that day, causing her to fall to the ground. Following that incident, Parker, while driving with her friend Donald King, spotted appellant, who had absconded from a halfway house, on the street and chased him in her vehicle. King held appellant down until police arrested him—further evidence of Parker's resolve to see him prosecuted. Appellant acknowledged this chase.

Upon this record, the trial court found that Parker was "dogged in her efforts to prosecute [appellant] to protect herself and her children before and after his CPO testimony." That finding is amply supported by the record, and we discern no reason to disturb the trial court's rejection of appellant's claim that his CPO testimony "possibly motivated Ms. Parker to testify in the grand jury and at trial."

We do not overlook that the types of insults and accusations appellant hurled at Parker during his CPO testimony can be—in some contexts and for some people—fighting words. Nor do we overlook that Parker had failed to appear as a witness against appellant at the first scheduled trial regarding the March 11 assault, or that a domestic violence complainant's initial efforts are not necessarily an accurate barometer of what her motivation will be

---

mony. She testified that if she had been given that information, she would have recorded it on the intake form. The trial court credited her testimony.

20. Parker also began recording appellant's phone calls to her.

as a case progresses.[21] But the track record of Parker's pre- and post-CPO hearing efforts to bring appellant to justice enabled the trial court to conclude that the government met its burden of proving by a preponderance of the evidence that appellant's immunized testimony was not a cause of Parker appearing and testifying in the criminal proceedings. We discern no reason to disturb that conclusion.

## 2. The relationship between appellant and Parker, and the alleged March 2000 assault.

In her direct testimony at the CPO hearing, Parker testified that she and appellant "used to date," explaining that they had dated from October 1999 until appellant assaulted her in March 2000. Parker also testified that in March 2000 (on or about March 11 [22]), appellant hit her in the eye after she asked him to leave her apartment (where the two had been living together) following a "disagreement." Appellant, who was unrepresented by counsel at the hearing, cross-examined Parker as to that testimony, asking her, "when we first met[,] we were smoking coke, that's how we met right[?]; that's when we started dating?" In response to a relevance objection from the Assistant Attorney General, appellant explained:

> Because I'm leading on to when we started dating. I don't want to leave out the facts as to when we started.... I don't want her credibility to try to overwhelm my credibility because what she's trying to do is make it look like we just met. And what we do, we go back. And we have a circle.[23]

Following his cross-examination of Parker, appellant took the stand. He asserts that his testimony contained "significant new information," including an account of his relationship with Parker that was very different from the one Parker had described and his account of what precipitated the March incident. Specifically, appellant testified that his relationship with Parker began in 1995 and ended in July 2000 (although he and Parker "w[eren't] dating exactly for those five years," during some of which he was in jail). Appellant described Parker as a "crack head" and testified that she and appellant had "smoked crack" together. Appellant further testified that he had "no recollection of an incident happening on March 12th," but described an incident that he claimed occurred on March 3, 2000. According to appellant, Parker had asked him to "babysit her kids so she could go out." Appellant told Parker that he, too, was "going out," and Parker "got mad," calling appellant "bitch" and throwing a cell phone at him. Appellant stated that, as he was putting his clothes on to leave, Parker pushed him, grabbed a bat and an ax, and told her son to call the police. Appellant testified that Parker was "never hurt."

Almost four months after the CPO hearing—in January 2001—Parker testified at trial. In her trial testimony, Parker described her relationship with appellant by saying "I met him in '94. And we used to have a drug and sex relationship.... We did drugs and had sex. That was it.... We used to smoke crack cocaine together." Parker further testified that she and appellant did drugs together for about eight

---

21. Appellant cites authority that approximately 80 percent of domestic violence victims in criminal cases ultimately dismiss charges against their abusers. Judge David M. Gersten, *Evidentiary Trends in Domestic Violence*, 72 Fla. B.J. 65, 65 & n. 3 (1998).

22. Parker mistakenly testified that the assault occurred on March 12, 2000.

23. There is no indication in the transcript that appellant made this statement during a bench conference, out of earshot of Parker.

or nine months from 1994 to 1995. She testified that her earlier relationship with appellant ended after she started studying with Jehovah's Witnesses and decided to change her life after having used cocaine for three years. Parker testified that she did not see or hear from appellant from 1995 to 1999, but that they "started seeing each other" again in October 1999.

Regarding the March incident, Parker testified that she had asked appellant to watch her twin sons that morning because "[appellant] was in the bed and ... [she] wanted to go to the grocery store to get some breakfast food." Parker stated that she was not aware that he "already had previous plans to go out." According to her, appellant "flicked out" and said " 'I'm not no fucking babysitter. And I'm not watching nobody's damn kids.... I got something to do.' " Parker told appellant to get dressed and go home. When Parker then walked over to appellant's side of the bed, appellant punched her in the face with his fist. The government introduced photographs showing how Parker's eye looked after the assault.[24]

Appellant now argues that Parker's trial testimony regarding her relationship with appellant was in direct response to his testimony at the CPO hearing. He contends that in this testimony, Parker added "new facts and events that ... added depth to her story" and "significantly strengthened the credibility of her allegations." Emphasizing the importance of "narrative" in domestic violence cases, appellant characterizes Parker's CPO testimony as "bare-boned" and asserts that her trial testimony added "descriptive richness"[25] that gave the jury a view of the relationship between the parties that "inform[ed] [their] credibility decisions and ... conclusions about what occurred," "improv[ed] the clarity and strength of [the government's] presentation," and "added context—and credibility—to her claims that [appellant] was the initial aggressor." Appellant also asserts that through the testimony that Parker gave in reaction to his testimony about their early relationship and drug use—Parker's admission in her direct trial testimony that she had been a drug user but had changed her life by studying to become a Jehovah's Witness— the government was able to "blunt[ ] the impact of ... damaging information" that the defense could introduce. Appellant contends in addition that Parker's trial-testimony account about asking him to babysit so that she could go out to buy breakfast items and her references to his using vulgar language were intended to counter his CPO testimony about Parker going out to "sell her body," and to buttress her image as a good mother and family caretaker while portraying him badly. Appellant argues that the government did not prove that this testimony was independent of Parker's exposure to his immunized testimony.

We reject appellant's argument that Parker's testimony about her early relationship with appellant was based on her memory being refreshed or her attention being focused by his immunized testimony. To the contrary, as the account above shows, prior to testifying, appellant had already drawn Parker's attention to that early history through his cross-examination question and through the statements he made to the court in response to the relevance objection. It was only appel-

24. Regarding the alleged March 11 assault, appellant testified at trial that Parker threw a cell phone at him and punched him in the face, that her teenaged son threw a knife and swung a bat at him, and that he hit Parker and her son in self defense.

25. *Old Chief v. United States*, 519 U.S. 172, 187, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

lant's "testimony" that was immunized, D.C.Code § 16–1002(c), not his cross-examination questions or his unsworn statements to the court.[26]

Regarding Parker's trial testimony about the context of the March 11 assault, the government showed at the *Kastigar* hearing that Parker reported to Smith–McGuire some of the additional information that testimony supplied, including that Parker and appellant began to argue after appellant "said that he was going out and couldn't watch [Parker's] children." We agree with appellant, however that the account that Parker gave of the March 11 incident appears to have been affected by his immunized testimony; as discussed above, Parker added details seemingly designed to improve her image. We generally agree with the trial court that "[t]he law does not require that a witness use the same words or syntax in relating testimony or limit the prosecutor from presenting evidence that was not presented at the CPO hearing," but we conclude that the trial court erred in finding that "[n]othing in [appellant's] CPO testimony ... affected the substance of Ms. Parker's testimony."

Nevertheless, we agree with the government that the additional details Parker added in her trial testimony were tangential, and that, in light of the volume of the government's evidence against appellant and the evidence that amply exposed the failings of both Parker and appellant, any "incremental support [they] lent to Parker's credibility" in all reasonable probability made no difference in the outcome of the trial. In other words, we think this use of appellant's immunized testimony was harmless beyond a reasonable doubt.

### 3. The March 13 Threat.

 During the CPO hearing, appellant cross-examined Parker about her failure to appear in court for his initially scheduled trial regarding the alleged March 11 assault. Parker explained that she did not appear "because [she] didn't know that [she] was supposed to come." Appellant also asked Parker, "[i]sn't it a fact that you ... called [my attorney] ... to find out ... the situation with me[?]" Appellant posed this question as part of a compound question, and Parker responded to a portion of the question without saying whether she had telephoned appellant's lawyer.

During his immunized testimony, appellant testified that Parker failed to show up for his earlier scheduled trial because "she wanted [them] to get back together." Appellant also said that Parker "constantly" called his lawyer to inquire about "the status of [their] relationship." Appellant testified that the case was eventually dismissed "because [Parker] didn't want to pursue [the charges] because after a while she felt that ... she was wrong and ... shouldn't have had [him] locked up."

Subsequently, at trial, Parker testified that on March 13, 2000, appellant called her at home and stated, "Bitch, if I go to jail, I am going to fuck you up." Parker testified that after she received this phone

---

**26.** Our analysis is the same as to appellant's argument that, at trial, Parker added "new testimony illustrating her desire to end the relationship" and new testimony that appellant's drug use "resulted in hostility." In his cross-examination of Parker at the CPO hearing, appellant asserted that Parker had allowed him to continue living with her until July 2000, when she claimed to have found drugs in the house, and that Parker was jealous of his relationship with other women. Parker had responded then—i.e., before hearing appellant's immunized testimony—that appellant was "back on crack" before March, that this had started his anger and mood swings and precipitated the March 11 assault, and that it was appellant who was jealous of her.

call, she called appellant's attorney. She "didn't tell [the] lawyer that [appellant had] threatened [her]," but she was "scared," so she told his lawyer that she "was not going to press charges." She further testified that she did not show up for the trial because she "never received" the subpoena that was sent to her, and that "[t]here is another gentleman in my building, his last name is Parker and we get each other's mail sometimes." She said she would have gone to court if she had known when the trial was going to be held. In response to a question asking for clarification, Parker stated that she did not show up because she was "afraid of [appellant]," but that if she had received the subpoena, she would have gone because she "wouldn't have [had] any other choice."

Appellant asserts that this trial testimony was the first time Parker linked her failure to appear for his trial to a threat, and that the threat allegation and the additional details that Parker offered for her failure to come to court were affected by his immunized testimony about her failure to appear and about her call to his lawyer out of a desire to resume their relationship after the March incident. But, as described above, it was appellant's (non-immunized) cross-examination questions about Parker's not appearing in court and calling his lawyer that drew Parker's attention to these subjects.[27] In addition, at the *Kastigar* hearing, the government pre-

sented evidence that Parker told Smith–McGuire about the March 13 threat before the CPO hearing. The government introduced a sworn statement signed by Smith–McGuire on September 12, 2000, that described threats appellant had made to Parker on both March 13 and September 9, 2000. The statement indicated that appellant had telephoned Parker on March 13, 2000, and told her that "if he went to jail, he would fuck her up." In light of the foregoing, we are satisfied that the government met its burden of proving an independent derivation of the trial testimony it presented about the March 13 threat.

### 4. The August 22 Threat.

 The 15–count indictment charged appellant with threatening to kill Parker and her children during a telephone call on August 22. During the CPO hearing, Parker did not testify about an August 22 threat, but only about a call, recorded and played at the CPO hearing, in which appellant "admitt[ed] that he gets high." During his immunized testimony, appellant denied ever threatening Parker, but he acknowledged that in August 2000, he was "angry" with Parker because she had placed posters with his picture on it in stores and on poles, and the posters stated that appellant had threatened to kill Parker and her two sons (posters that appellant testified he saw "before the 20th

---

**27.** We also agree with the trial court that Parker's testimony at the CPO hearing that she did not know she was supposed to come to appellant's trial regarding the March 11 assault was "tantamount to saying she did not receive notice of the event," as she testified at trial

 Appellant also points to Parker's trial testimony that she obtained a restraining order against him in March as testimony that responded to his CPO hearing testimony about her not having previously tried to obtain a protection order and about her not pursuing

relief in the courts because she "felt that ... she was wrong" and wanted to get back together with him. But this trial testimony by Parker was evidence that the *defense* elicited by asking "[d]id you at this time ... seek a restraining order against him?" It is "the *government's* use of its knowledge of ... immunized testimony to elicit evidence on cross-examination [that] ... would ... constitute an impermissible use" of evidence derived from the immunized testimony. *United States v. Byrd,* 765 F.2d 1524, 1531 (11th Cir.1985) (emphasis added).

something" of August).[28]

At trial, Parker testified that, on August 18, appellant threatened to kill her and her kids, and that thereafter she created and put up in the neighborhood "wanted" posters with his picture on them. She testified that on August 22, appellant, who was "angry" because he had noticed the posters, called her and said, "I am going to kill you because I'm tired of people telling me that you are hanging my pictures up. I keep seeing my pictures everywhere." Appellant asserts that this testimony was the first time Parker ever mentioned a motive for the alleged August 22 threat, and that it was based on his immunized testimony that he was "angry" about the posters.

During the *Kastigar* hearing, the government submitted no evidence that prior to appellant's CPO-hearing testimony, Parker had mentioned the posters as a motive for the August 22 assault. The arrest report for that date, which the government introduced into evidence, states that "Defendant called [Parker] at home and stated 'I am going to kill you bitch,'" but it makes no mention of the posters. Smith–McGuire's affidavit about the September 9 threat ties a *September* in-person threat to anger over the posters, but it makes no such connection for a threat made by telephone on August 22. We agree with appellant that the government failed to prove that the portion of Parker's testimony that ascribed to appellant a motive for the August 22 threat was derived from a source

wholly independent of appellant's immunized testimony. Here, too, the trial court clearly erred in "finding nothing in [appellant's] CPO testimony that affected the substance of Parker's testimony."

■ This motive testimony was not insignificant evidence. Of course, the government is not required to prove motive, but "lack of evidence of a motive" can be considered by the jury in "deciding whether the government has proved the charge beyond a reasonable doubt."[29] The additional important factor here is that the government emphasized this motive in its closing argument. The prosecutor asked the jury, "Isn't this [Parker's having created the posters] what started it all, started him from just pestering her and calling her to becoming angry and violent? Because once this poster got posted all over the neighborhood[,] ... this poster made Kenneth Aiken angry."[30] In light of this emphasis by the government, we cannot say that the motive testimony was harmless beyond a reasonable doubt as to appellant's conviction for the August 22 threat. Accordingly, we agree with appellant that he is entitled to reversal of his conviction on that charge.

### C. The Testimony of David Brox

■ At the CPO hearing, appellant testified that Parker had "harbor[ed]" his crack-cocaine-using cousin in her house, and suggested that the harassing phone calls Parker claimed to have received (the

---

**28.** The posters stated: "Kenneth Aiken[,] WANTED FOR DOMESTIC VIOLENCE[,] IF YOU SEE THIS PERSON PLEASE CALL THE POLICE. HE HAS THREATENED TO *KILL* TWO EIGHT YEAR OLD TWIN BOYS AND THEIR MOTHER. PLEASE HELP STOP THIS FROM HAPPENING."

**29.** Criminal Jury Instructions for the District of Columbia 2.307; *see also Bright v. United States*, 698 A.2d 450, 458 (D.C.1997) (approving a similar instruction).

**30.** During his own testimony at trial, appellant acknowledged that he was upset and angry about the posters, but said that he "wasn't upset to the point that he would kill her" and denied threatening to do so. We cannot know whether he would have testified in the absence of Parker's testimony regarding the same.

basis of the stalking charge) were made by people from whom the cousin had taken money. At trial, the cousin (David Brox) testified that, at the time of trial, he had known Parker for five or six years. He testified that he met Parker while they "were in [their] addictions," but that he moved in with Parker on August 23, 2000, because he had "got[ten] tired of drugs" and "knew that [Parker] didn't use drugs anymore." Brox testified that he was in bed on the morning of August 26, 2000, when he heard glass shattering. He ran to the living room, saw a broken window, and as he looked through the window, saw appellant run through an alley. The next morning, Brox heard another window shatter and again saw appellant run away from the apartment.

In remanding for the *Kastigar* hearing, we noted particular concern about whether "David Brox may have become a prosecution witness because Detective [Herndon] or Parker heard appellant at the CPO hearing attribute some of Parker's harassment to Brox's enemies." *Aiken I*, 956 A.2d at 50. We said that it was unclear from the record before us at that time "how the government identified Brox as a potential witness, or whether it did so prior to the CPO hearing." *Id.*

At the *Kastigar* hearing, the government presented proof that it identified Brox as a witness before the CPO hearing. Smith–McGuire's intake form indicates that, on September 8, 2000, Parker told Smith–McGuire that appellant's cousin had been living with her, and on September 13, 2000, Parker gave Smith–McGuire a list of witnesses that specifically included Brox.

Moreover, Parker could be heard speaking to "David" during a 911 call on August 21, 2000, and five days later, in another 911 call, Parker explained to the dispatcher that appellant's cousin had just called her to report that appellant had broken two of Parker's apartment windows. On August 27, 2000, Brox himself called 911. Although he did not identify himself by name, he told the 911 dispatcher that he was "staying at his friend's apartment" and that he had just seen appellant break another window. We conclude, therefore, that the trial court did not err in finding that the government met its burden of proving that it had identified Brox as a potential witness prior to the CPO hearing.

■ Appellant is correct, however, that the government did not prove that it was aware of Brox's cocaine addiction (and claimed recovery therefrom) from a source other than appellant's immunized testimony.[31] Thus, the trial court erroneously found that his trial testimony was untainted evidence. Appellant argues that Brox's admission during his direct testimony at trial that he was a drug addict preempted defense challenges to Brox's credibility, specifically "preempt[ing] any defense claim that Brox would not be a reliable witness due to his drug use and undermin[ing] the defense theory that Brox had gone to live with Parker to avoid people from whom he had stolen money."

■ The government argues that Brox's admission of his history of cocaine use was harmless beyond a reasonable doubt. But Brox's testimony, and thus his credibility, was critical as to two of the

---

**31.** Appellant notes that Herndon testified that she spoke to witnesses after the CPO hearing, and that the government presented no evidence to prove that a Herndon–Brox conversation did not impermissibly taint and bolster his testimony.

We assume that the government would have learned independently that Brox had

been convicted of distribution of heroin and of distribution, attempted distribution, and possession of cocaine, background information that he confirmed during his trial testimony and that is the type of information that the government routinely investigates about its witnesses. But the issue here is Brox's cocaine addiction.

property destruction charges. In closing argument, the prosecutor emphasized that Brox heard crashes (windows breaking) on "both occasions" (August 26 and 27) and saw appellant on the scene. In addition, in finding appellant guilty of the misdemeanor offenses of destruction of property charged in Counts 8 and 9, the trial court specifically cited Brox's testimony that he saw the defendant in the area or running away from the area in finding him guilty.[32] Accordingly, we agree with appellant that he is entitled to reversal of his convictions on the charges of destruction of property about which Brox testified (Counts 8 and 9).

### IV. Conclusion

For the foregoing reasons, we conclude that while the government did not meet its burden to show that no use was made of appellant's immunized testimony, the conceivable uses suggested by the record were harmless beyond a reasonable doubt, except those related to the alleged August 22 felony threat (Count 6) and two of the misdemeanor destruction of property charges (Counts 8 and 9). Appellant cannot establish that, as to his convictions on the other charges, he was prejudiced by his counsel's failure to request a *Kastigar* hearing. Accordingly, we affirm the order of the trial court denying appellant's D.C.Code § 23–110 motion as to most of his convictions, but we reverse the convictions on Counts 6, 8, and 9.

*So ordered.*

**32.** Shirley Jones, a neighbor in Parker's apartment building, also testified that on two occasions she saw appellant kicking the windows out in Parker's apartment. (According to the government's post-*Kastigar* hearing memorandum, Jones was identified in the police reports of officers who responded to Parker's apartment on August 21.) However, the trial court specifically relied on Brox's testimony and appeared to downplay Jones's, noting that Jones "was not sure what the dates were."