STATE of Wisconsin,
Plaintiff-Respondent,

v.

Karl L. QUIGLEY, Defendant-Appellant.

Court of Appeals

*Nos. 2015AP681–CR & 2015AP682–CR. Submitted on briefs February 25, 2016.—Decided June 15, 2016.*

2016 WI App 53

(Also reported in 883 N.W.2d 139.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *John R. Breffeilh*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Warren D. Weinstein*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Neubauer, C.J., Reilly, P.J., and Hagedorn, J.

¶ 1. NEUBAUER, C.J. Karl L. Quigley appeals from a judgment entered after he pled no contest to two criminal complaints charging him with various sex offenses against P.R., a minor female. Quigley contends that statements he gave to a detective should have been suppressed because they were made while in custody without the benefit of *Miranda*[1] warnings. Quigley also contends that his right against self-incrimination was violated when, after he was compelled to make a statement to his probation agent, the police reinterviewed P.R. We disagree with the former, but agree with the latter. The State concedes that this error, if we so find, requires that the entire plea to both criminal complaints be set aside. Therefore, we reverse the judgment.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

## BACKGROUND

### Quigley's Initial Encounter with Police at McDonald's

¶ 2. Quigley was charged with nine felonies under Kenosha County case No. 2012CF360. The charges stemmed from a complaint made on March 14, 2012, by a manager at a McDonald's restaurant that Quigley was acting inappropriately with P.R. Police Officer Willie Hamilton, along with two other officers, responded to the scene and spoke with the manager who told him that he saw P.R. place her legs on Quigley and her head on his shoulder.[2] The manager was concerned because she did not think that Quigley was P.R.'s father. Hamilton questioned Quigley and P.R. separately. Hamilton saw a bag with two cellular phones inside; he asked and was given consent to look at the phones. Hamilton discovered that one of the phones— Quigley and P.R. did not agree on who owned which phone—had nude photographs and videos of P.R.[3] Hamilton asked Quigley about the nature of his relationship with P.R., and he said that "he loved her."[4] Quigley "knew it was wrong," and "he even told her

---

[2] According to Hamilton's report, the manager had seen Quigley and P.R. in the restaurant on a consistent basis for three months. The manager thought they might be having a sexual relationship because they would snuggle together, lay on each other, and kiss each other. The manager became worried when she overheard P.R. say she was fourteen years old.

[3] According to Hamilton's report, P.R. told him that she took the photographs at Quigley's request.

[4] According to Hamilton's report, Quigley said he had kissed P.R. numerous times on her lips, touched her back, the inside of her thighs, and her buttocks; however, he denied having sexual intercourse with her. P.R. also told Hamilton

mother if she was old enough, he would marry her." Hamilton told Quigley that "[h]e needed to come to the police department to speak with a detective about the case." Quigley agreed to speak with a detective. Hamilton patted Quigley down and placed him uncuffed in the back of his squad car, which could not be opened from the inside. Hamilton brought Quigley to the police station and had him wait in a waiting area while Hamilton spoke with his supervisor. Hamilton never told Quigley that he was being taken into custody.

¶ 3. The waiting room was about ten by sixteen, with multiple seats, a television set, and two doors. The doors led to the hallway and the detective bureau. The doors were closed but not locked. No one was stationed in the waiting room to guard Quigley.

¶ 4. While Quigley waited, Detective Jason Melichar interviewed P.R. who provided him with a written statement. In the statement she said that she and Quigley had kissed, that in November 2011 he had exposed his penis to her and had asked her to touch it, and that at his request she had recorded sexually explicit videos of herself.

### The Police Interview Quigley

¶ 5. After waiting more than an hour, according to Quigley, Melichar brought him into an interrogation room and began questioning him. At the time, Quigley was on probation. Quigley had been on probation on five or six prior occasions and also had been previously subject to a probation hold. Quigley believed that he had to cooperate with the police in order to avoid being

that Quigley had touched her buttocks and that the two had kissed; she also denied any sexual intercourse.

711

placed on a hold. But, in any case, whether he cooperated or not, Quigley thought he would be placed on a hold.

¶ 6. According to a transcript of the interview, Melichar told Quigley that he wanted to explain a couple of things to make sure that "we're clear." Melichar stated that he wanted to make sure that Quigley understood that he was not under arrest, that he was free to leave, and that they were "here just to talk about this case." Quigley confirmed that he understood. Quigley acknowledged to Melichar that while being transported to the police department he had not been placed in handcuffs or told he was in custody.

¶ 7. During the course of the interview, Melichar asked Quigley about how he met P.R.—through her father; how long he had known her—three years; and the nature of their relationship—"a very good friend." As the interview progressed, Quigley said that P.R. had kissed him with her tongue, had flashed her breasts at him, and had touched his penis over his pants. Quigley had smacked her on her buttocks and had asked her to make videos of herself with a phone he had purchased for her.

¶ 8. At this point in the interview, Quigley told Melichar that he was "getting ready to be arrested" because he knew what he "was doing [was] wrong." Melichar asked Quigley if his feelings had changed about being there freely, and Quigley responded, "[n]o, I did come here freely." Quigley denied that Melichar had done anything to make him feel differently, but Quigley knew that he was going to be arrested. Since Quigley's "perception" had changed and he did not think he was there freely anymore, Melichar said he would get a waiver of constitutional rights form so that

712

they could keep talking about the case. Melichar left the room in order to get the *Miranda* form.

¶ 9. While Melichar was outside the interview room, he called Quigley's probation agent and was informed that a hold would be placed on Quigley.

¶ 10. Once Melichar returned to the interview room, he read Quigley *Miranda* warnings from a form, which also contained an acknowledgment and waiver of those rights. Melichar asked Quigley if he understood everything that had been read to him. Quigley asked if he was under arrest. Melichar responded that if Quigley perceived that he was in custody, Melichar was going to read the form "just to be on the safe side and to make sure" that Quigley understood his rights before Melichar asked him any other questions. Quigley replied, "but isn't this . . . what they usually read right before they arrest you?" Melichar could not "really interpret" the form or give his "explanation of what it is" because then he would be getting "into kind of some legal stuff" that he could not get into. Melichar continued, "[t]his is a form informing you of your rights. I want to make sure you understand your rights and before I ask any questions." Quigley cut Melichar off, saying, "I understand my rights," and "[y]ou can just go ahead and tell me if I'm being arrested." Melichar said he did not know if Quigley was going to be arrested because he was still investigating the case and did not know all the details, although he thought it was "probably likely" that he would be arrested. Quigley said he was not a lawyer, and Melichar answered that neither was he. Melichar again asked if Quigley understood the form that had been read to him, and Quigley said that he did. Quigley refused to sign the *Miranda* form, but he was willing to continue answering questions.

¶ 11. Quigley asked if he could "step outside and have a cigarette and wake" himself up. Melichar could not allow that, but he offered to get Quigley a soda, to allow him to use the restroom, and to walk back and forth in a larger room. Quigley did not think it made sense that he was there voluntarily but could not have a cigarette. Melichar responded, "that's kind of changed . . . your perception of you being here voluntarily [has] kind of changed. And that changes things for me, too."

¶ 12. Then, when asked, Quigley denied that anyone had forced him to come to the police station, that he had come of his own free will, and that no one had made him do anything. Quigley asked if he could have run out of McDonald's and never come to the police station, and Melichar said, "[y]ou sure could have."

¶ 13. Melichar informed Quigley that his probation officer had elected to put a hold on Quigley. Quigley said he "already knew that." Melichar told Quigley that since Quigley was tired, Melichar would let him rest and "sit tonight on a PO hold." Melichar said he would interview Quigley again the next day. The entire interview lasted one hour and twenty minutes.

*The Probation Department Interviews Quigley*

¶ 14. The following day, March 15, 2012, Quigley spoke with a probation officer. In that statement, Quigley admitted to touching P.R.'s vagina and breasts and having her touch his penis in February 2012. He also mentioned that his "mouth [h]as been on her vagina and her mouth has been on [his] penis." At the top of the statement that Quigley wrote, he was

advised that none of this information could be used against him in criminal proceedings.

¶ 15. On March 26, 2012, the State filed the nine-count criminal complaint in Kenosha County case No. 2012CF360.

### The Police Reinterview P.R.

¶ 16. On March 28, 2012, the Department of Corrections (DOC) forwarded Quigley's statement to the Kenosha County district attorney. In an affidavit from an assistant district attorney, filed later in response to Quigley's motion to suppress, the assistant stated that he directed Melichar to interview P.R. again after the assistant received Quigley's probation statement.

¶ 17. In August 2012, at the request of the district attorney, Melichar interviewed P.R. again. P.R. stated that in October 2011, while at her mother's house, Quigley exposed his penis to her and repeatedly asked her to touch it. In November 2011, Quigley again exposed his penis, P.R. said, and asked her to touch it. He also put his hand down P.R.'s pants and touched her vagina. In December 2011, he had P.R. touch his penis.

¶ 18. Following this interview, on August 6, 2012, the State charged Quigley under Kenosha County case No. 2012CF884 with first-degree sexual assault, sexual assault of a child under sixteen years of age, and two counts of exposing genitals.

¶ 19. In October 2012, the State moved to join the two criminal complaints. In doing so, the State noted that it had requested that Melichar ask P.R. if any other incidents had occurred because the "State

715

suspected that there were more incidents as [Quigley] described additional sexual conduct to his probation agent."

*Quigley's Motion to Suppress P.R.'s
Statements from the Reinterview*

¶ 20. Quigley moved to suppress the statement he gave to the DOC and all the evidence that was derived therefrom, including P.R.'s August 2012 statement, on the ground that the DOC statement was compelled. The State conceded that Quigley's statement to the DOC was compelled and should be suppressed. Nevertheless, the State argued, P.R.'s August 2012 statement should be admissible into evidence. In an affidavit from an assistant district attorney, he said that he would have asked Melichar to interview P.R. again even without the DOC statement because P.R. seemed reluctant to talk at first and children are generally prone to make disclosures piecemeal. In addition, the incidents P.R. related were wholly separate from those that Quigley related.

¶ 21. At a hearing on the motion to suppress, Melichar testified that he interviewed P.R. again in August 2012 at the request of the district attorney. However, Melichar believed that he would have interviewed P.R. again anyway. He would have followed up with P.R. because he did not think she had told him the whole truth. He thought that she was holding things back and that the passage of time would help her be more forthcoming. It was normal for Melichar to conduct another interview under these circumstances.

¶ 22. The circuit court denied the suppression motion. The court found "that the basis for the re-interviewing of [P.R.] was *because* [Quigley] described

additional sexual conduct to his probation agent." (Emphasis added). Thus, "the real question" for the court was whether P.R.'s statement was derived from a legitimate source wholly independent of Quigley's DOC statement. The court compared the statements P.R. made with those that Quigley made and concluded that they were talking about different incidents—P.R. about incidents that occurred in October, November, and December 2011, and Quigley about incidents that occurred in February 2012. The basis for the charges in 2012CF884 were the incidents that P.R. related, and not those that Quigley related. In other words, there was "no nexus" between the statements Quigley gave to the DOC and the charges in 2012CF884. It must be Quigley's argument, the court said, that the State would have never interviewed P.R. again had Quigley not made those statements to the DOC. As to whether the police would have followed up with P.R. even if Quigley had not given a statement to the DOC, the court did not know "*whether that is true*"—but the police "certainly had a right to do that because the other case, 12–CF–360, was still pending." (Emphasis added). In short, the court believed that the State had acted properly.

### *Quigley's Plea and Sentence*

¶ 23. On February 18, 2013, Quigley pled no contest to three counts in Kenosha County case No. 2012CF360 and two counts in Kenosha County case No. 2012CF884. The remaining counts were dismissed and read in.

¶ 24. Quigley was subsequently sentenced to twenty-one years of initial confinement to be followed by eighteen years of extended supervision and then three years of probation.

### Quigley's Motion for Postconviction Relief

¶ 25. Quigley then moved for postconviction relief, arguing that he should be entitled to withdraw his plea because he was deprived of the effective assistance of counsel. Specifically, counsel was ineffective because he failed to seek suppression of the statements Quigley made to Melichar before he was read *Miranda* warnings.

¶ 26. During a *Machner*[5] hearing, counsel testified that together he and Quigley had viewed the videotape of Melichar interviewing Quigley. Counsel did not seek suppression of the statements Quigley made to police because he did not think such a motion would have been successful.

¶ 27. Quigley testified that counsel never discussed with him seeking suppression of the statements he made to police. Had counsel filed a motion to suppress and had it been granted, Quigley would not have pled no contest.

¶ 28. The circuit court denied the motion. The court found that Quigley was not in custody because he was told he was not under arrest and was free to leave, the purpose of the interrogation was investigatory and of short duration, and he was patted down but never restrained. While the court accepted that Hamilton told Quigley that he needed to go to the police department, this did not trigger custody because Quigley knew that because he was on probation he had to cooperate with the police or face the possibility of violating his probation. Since Quigley was not in custody, any motion to suppress brought on that basis would have been denied. Since the motion lacked

---

[5] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

merit, counsel's representation could not have been deficient and Quigley could not have been prejudiced by the failure to make the motion.

## ANALYSIS

### *The Privilege Against Self-Incrimination*

¶ 29. Quigley raises two claims, both based on the privilege against self-incrimination. The first, pursuant to *Miranda*; and, the second, pursuant to *Kastigar*.[6]

¶ 30. The Fifth Amendment to the United States Constitution provides, in part: "No person . . . shall be compelled in any criminal case to be a witness against himself." This privilege has been incorporated via the Fourteenth Amendment to apply to the States. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). Article I, section 8 of the Wisconsin Constitution contains an equivalent privilege.

### *The Miranda Claim*

■

¶ 31. In order to protect a suspect's Fifth Amendment privilege against self-incrimination, a suspect who is interrogated while "in custody" is entitled to *Miranda* warnings.[7] *See Stansbury v. California*, 511 U.S. 318, 322 (1994). This is because, when a suspect is

---

[6] *Kastigar v. United States*, 406 U.S. 441 (1972).

[7] Prior to questioning, a suspect must be warned that he or she has the right to remain silent, that anything he or she says can be used against him or her in a court of law, that he or she has a right to an attorney, and that if he or she cannot afford an attorney one will be provided free of charge. *Miranda*, 384 U.S. at 479.

719

in police custody, there is a heightened risk of obtaining statements that "are not the product of the suspect's free choice." *J.D.B. v. North Carolina*, 564 U.S. 261, 268–69 (2011).[8]

¶ 32. In *Miranda*, the Court described "custody" as when a suspect has been "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Custody means "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (citation omitted); *State v. Lonkoski*, 2013 WI 30, ¶ 6, 346 Wis. 2d 523, 828 N.W.2d 552.

¶ 33. In making that determination, courts will look to the totality of the circumstances, including "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint." *Lonkoski*, 346 Wis. 2d 523, ¶ 6 (citation omitted). On the latter, courts have considered whether the defendant was handcuffed, whether a gun was drawn on the defendant, whether a *Terry*[9] frisk was performed, the manner in which the defendant was restrained, whether the defendant was moved to another location, and the number of police officers involved. *State v. Gruen*, 218 Wis. 2d 581, 594–96, 582 N.W.2d 728 (Ct. App. 1998). The test "is an objective one," that is, "whether a reasonable person in the suspect's position would have considered himself or herself to be

---

[8] If someone is subjected to custodial interrogation without the warnings and makes statements, whether exculpatory or inculpatory, then those statements constitute a *Miranda* violation and, absent exceptions, cannot be used by the prosecution. *Miranda*, 384 U.S. at 444.

[9] *Terry v. Ohio*, 392 U.S. 1 (1968).

in custody." *State v. Goetz*, 2001 WI App 294, ¶ 11, 249 Wis. 2d 380, 638 N.W.2d 386; *see Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

## *Ineffective Assistance*

¶ 34. To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must show that counsel's performance fell below an objective standard of reasonableness. *State v. Milanes*, 2006 WI App 259, ¶ 14, 297 Wis. 2d 684, 727 N.W.2d 94. To prove prejudice in the context of a plea agreement, a defendant must show that there is a reasonable probability that, but for counsel's errors, he or she would not have pleaded no contest and would have insisted on going to trial. *State v. Bentley*, 201 Wis. 2d 303, 312, 548 N.W.2d 50 (1996).

## *Standard of Review*

¶ 35. A claim of ineffective assistance is reviewed under a mixed standard: the circuit court's findings of facts will not be overturned unless clearly erroneous, but considerations of whether counsel provided deficient performance and whether the defendant suffered prejudice as a result are questions of law we review independently. *State v. Berggren*, 2009 WI App 82, ¶ 12, 320 Wis. 2d 209, 769 N.W.2d 110.

¶ 36. Quigley argues that a reasonable person in his position would not have felt free to end Melichar's interview and leave the police station. This is because, based on Quigley's past experience, his encounter with the police would result in him being placed on a probation hold. Quigley also points to the fact that he heard Hamilton asking P.R. a series of questions suggesting that Quigley was having an inappropriate and criminal relationship with her, which he knew was wrong, and the police found naked photographs of P.R. on Quigley's phone. Hamilton told Quigley he "needed" to come to the police station. Quigley was then patted down, placed in the back of Hamilton's vehicle, and transported to the police station. The police isolated Quigley in a police waiting room for an hour, and then he was taken to a separate interrogation room where he was questioned about his criminal activity.

¶ 37. The State acknowledges that the question of whether Quigley was in custody is "a close question," and we agree. However, we conclude that the circuit court did not err in determining that, under the totality of the circumstances, Quigley was not in custody.

¶ 38. The purpose of the interrogation was to further investigate sexual offenses against a child. *See State v. Ezell*, 2014 WI App 101, ¶ 13, 357 Wis. 2d 675, 855 N.W.2d 453 (being questioned about suspected crimes was one factor that led the court to conclude the defendant was in custody). At the same time, though, the tone of the interview with Melichar was not confrontational or accusatory. *See United*

*States v. Bassignani,* 575 F.3d 879, 884 (9th Cir. 2009). It was conversational. *See Dyer v. Hornbeck,* 706 F.3d 1134, 1140–41 (9th Cir. 2013) ("We do not read the transcript of the interrogation here to suggest the sort of tone that would communicate to a reasonable innocent person that her participation was not voluntary."). The interview was not lengthy, lasting less than ninety minutes.

¶ 39. Regarding the degree of restraint, before Quigley was interrogated at the police station, Hamilton patted him down, placed him in the back of a locked police vehicle, and transported him to the police station, all factors which weigh in favor of a finding of custody. However, Quigley agreed to speak with a detective. He was never restrained with handcuffs. When they arrived at the police station, Quigley was placed in a waiting room while Hamilton went to speak to his supervisor. Quigley was not handcuffed to a seat and no officer remained waiting with him. There were two doors in the waiting room and it appears Quigley could have exited them without hindrance. *See id.* at 1140 (during a break, defendant got up, left the room, walked to a restroom, used it, and then returned to the interview room; detective testified that defendant could have left the station from there). These factors weigh in favor of a finding of a lack of custody.

¶ 40. After waiting an hour, Quigley was brought into an interrogation room. At the outset, Melichar, the only police officer in the room, confirmed with Quigley that no one had told him he was under arrest. Melichar advised that he wanted to make clear that Quigley understood that he was not under arrest, that he was free to leave, and that they were "here just to talk about this case." Melichar's advisements that Quigley

was not under arrest and was free to leave are "of substantial importance." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). Such advisements are "not talismanic," but they are "highly probative," and, considering the other factors in this case, lead us to conclude that the balance of circumstances weigh towards noncustody. *United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010); *see Coomer v. Yukins*, 533 F.3d 477, 487 (6th Cir. 2008) (collecting several cases for the proposition that advising a suspect that he or she is free to leave is a "powerful," "important," or "one of the most important" factors to consider, and that there is no governing United States Supreme Court precedent that has held that a person was in custody after being clearly advised that he or she was free to leave or terminate questioning).

¶ 41. Moreover, Melichar not only told Quigley he was not under arrest, he confirmed with Quigley that he understood that to be the case. Quigley affirmatively agreed, several times, that he came to the station of his own free will; no one forced him to come or told him that he was in custody—"I did come here freely." He stated that no one "made him do anything": he was not under arrest and was free to leave. Quigley's repeated confirmations were objective manifestations of the dynamics during transportation to the station and in the room. *See United States v. Hashime*, 734 F.3d 278, 285 (4th Cir. 2013) (defendant's statements are "objective factors" that bear on the general atmosphere of the interview as created by the police); *Brown*, 441 F.3d at 1348 ("The additional finding of fact that Brown said he understood the officers' advice that he was not under arrest and was free to leave strengthens the force of the instructions."); *see also United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th

724

Cir. 2005) (noting that "we think that it is highly significant that [the officer] informed [the defendant] at the outset of the interview that [the defendant's] presence was voluntary—information that [the defendant] actually understood, given his statements on the audio tape"). Moreover, Quigley never asked for the interview to end, never objected to any of the questions, and remained cooperative throughout the interview.[10]

¶ 42. Quigley makes much of the fact that he knew, because of his experience of being on probation, that his encounter with the police would result in a probation hold. But, Quigley's "subjective views" are irrelevant for purposes of determining whether he was in custody. *See State v. Mosher*, 221 Wis. 2d 203, 211, 584 N.W.2d 553 (Ct. App. 1998) ("This determination depends on the objective circumstances, 'not on the subjective views harbored by either the interrogating officers or the person being questioned.'") (quoting *Stansbury*, 511 U.S. at 323); *see also J.D.B.*, 564 U.S. at 271 (the objective custody test "involves no consideration of the actual mindset of the particular suspect") (citation omitted). "The relevant inquiry is how a reasonable person in the suspect's situation would

---

[10] Quigley argues that our unpublished decision in *State v. Burnside*, No. 2013AP1293–CR, unpublished slip op. (WI App Apr. 29, 2014) is "on point." Although we have no obligation to distinguish or even discuss *Burnside*, WIS. STAT. § 809.23(3)(b) (2013–14), we note that in *Burnside*, unlike here, the defendant was not advised, nor did he acknowledge, that he was free to leave. Rather, a detective, when starting a recording of the interview, said, "This suspect is not in custody and this is not a Mirandized interview." *Burnside*, ¶ 7. All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

understand the situation." *State v. Morgan*, 2002 WI App 124, ¶¶ 10, 23, 254 Wis. 2d 602, 648 N.W.2d 23. The standard is the "objective one of the reasonable person, not the subjective one of the suspect in the particular case, who may assume he or she is being arrested because he or she knows there are grounds for an arrest." *Id.*, ¶¶ 10, 23.[11]

¶ 43. In sum, Melichar's advisement to Quigley that he was not under arrest and was free to leave, which Quigley acknowledged, combined with other factors such as the lack of any physical restraint in the waiting or interview rooms that would have prevented Quigley from leaving, and the conversational and nonaccusatory tone of the interview, lead us to conclude that a reasonable person in Quigley's position would not have considered himself to be in custody.

¶ 44. Since we conclude that a motion to suppress the statements Quigley made to police would have been denied, counsel's failure to make that motion was not objectively unreasonable, and, thus, counsel's assistance in this regard was not ineffective. *See State v. Bellows*, 218 Wis. 2d 614, 625, 582 N.W.2d 53 (Ct. App. 1998).

## *The Kastigar Claim*

¶ 45. In certain instances, the government has a legitimate reason to compel a witness to give an incriminating testimonial statement. *See State v. Spaeth*, 2012 WI 95, ¶¶ 34, 79, 343 Wis. 2d 220, 819

---

[11] While the circuit court noted that Quigley was required to cooperate with the police because he was on probation, Quigley does not develop any argument that his probation status required him to go to the station or prohibited him from leaving.

N.W.2d 769. For example, compelling a probationer to account truthfully for his activities and whereabouts "is the very essence of the system of probation." *State v. Evans*, 77 Wis. 2d 225, 231, 252 N.W.2d 664 (1977). In order for the probation system to be effective—to guide the probationer away from criminal activity and toward useful and productive activities and to ensure the safety of the community—there must be adequate supervision of the probationer. *Id.* Since a probation agent "cannot maintain a personal surveillance over each probationer," the agent must depend on the reports of others and, at times, confront the probationer with that information and discuss it with him. *Id.* If the probationer refuses to give an account, that refusal may be grounds for revocation. *Id.*

¶ 46. Once a witness, such as a probationer, is compelled to give an incriminating testimonial statement, that witness is entitled to a grant of immunity coextensive with the Fifth Amendment privilege against self-incrimination. *See Kastigar v. United States*, 406 U.S. 441, 446, 449 (1972); *Spaeth*, 343 Wis. 2d 220, ¶¶ 34–36. This means that the government may not use the compelled testimony and any evidence directly or indirectly derived from such testimony in a subsequent criminal investigation. *Kastigar*, 406 U.S. at 453; *Spaeth*, 343 Wis. 2d 220, ¶ 36. Stated differently, the use and derivative use of any compelled testimony from the probationer is prohibited. *Kastigar*, 406 U.S. at 453; *Spaeth*, 343 Wis. 2d 220, ¶ 36. "Use immunity" prohibits the use of the particular information provided in the probationer's compelled statement. *See State ex rel. Douglas v. Hayes*, 2015 WI App 87, ¶ 11, 365 Wis. 2d 497, 872 N.W.2d 152. "[D]erivative use immunity" prohibits the use of "any evidence

subsequently discovered by authorities through direct or indirect utilization of the" compelled statement. *Id.* As examples, a witness is protected against " 'the use of his testimony to search out other testimony to be used in evidence against him,' " as well as against the prosecution's gaining from the testimony " 'a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness.' " *Kastigar*, 406 U.S. at 454 (quoting *Counselman v. Hitchcock*, 142 U.S. 547, 564, 586 (1892)).

¶ 47. Once a compelled, incriminating, testimonial statement has been obtained, the state bears the burden of demonstrating that the evidence it wishes to use is "derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460; *Spaeth*, 343 Wis. 2d 220, ¶ 74. This burden of proof is not met by simply negating or denying taint. *Kastigar*, 406 U.S. at 460. The state bears the burden of proof by a preponderance of the evidence. *United States v. Nanni*, 59 F.3d 1425, 1431–32 (2d Cir. 1995); *United States v. Schmidgall*, 25 F.3d 1523, 1528 (11th Cir. 1994). It is insufficient to meet the state's burden by merely denying that an immunized statement was used, even if that denial is made in good faith. *Nanni*, 59 F.3d at 1432; *United States v. Hampton*, 775 F.2d 1479, 1485 (11th Cir. 1985). Rather, the government must "document[] or account[] for" "[e]ach step of the investigative chain" by which the evidence was obtained from a legitimate source wholly independent of the compelled statement. *Hampton*, 775 F.2d at 1490.

## Standard of Review

¶ 48. The *Kastigar* issue involves the application of constitutional principles to facts. *Spaeth*, 343 Wis. 2d 220, ¶ 30. Thus, we accept the circuit court's findings of fact unless clearly erroneous but the application of constitutional principles to those facts we review de novo. *Id.*

### Independent Source: The State Has Not Met its Burden of Proof

¶ 49. The State has conceded that Quigley's statement to the DOC was compelled. At the top of his statement he was advised that none of the information could be used against him in criminal proceedings. Quigley's compelled statement to the DOC led the police to reinterview P.R. The DOC forwarded Quigley's immunized statement to the district attorney who directed Melichar to reinterview P.R., which he did. Indeed, this was the express finding of the circuit court: "the basis for the re-interviewing of [P.R.] was *because* [Quigley] described additional sexual conduct to his probation agent." (Emphasis added). Quigley's statement, as *Kastigar* teaches, furnished an "investigatory lead." *Kastigar*, 406 U.S. at 460. It led the police "to search out other testimony" from P.R. "to be used in evidence against" Quigley. *Id.* at 454. It was indisputably a "source[] of information" that supplied "other means of convicting" Quigley. *Id.*

¶ 50. The State cannot dispute that P.R. was reinterviewed because of Quigley's immunized statement and, consequently, acknowledges it must estab-

lish that P.R.'s statement was derived from a legitimate source wholly independent of Quigley's immunized statement. Nevertheless, the State argues that Melichar's decision to interview P.R. again would have been made "entirely apart from the motivating effect of the compelled" statement. The State points to the analysis applied by some federal circuit courts of appeals, when it appears that that pursuit could have been motivated by both tainted and independent factors, which requires the government to show that it would have taken the same steps *"entirely apart* from the motivating effect of the immunized testimony." *Nanni*, 59 F.3d at 1432 (emphasis added).

¶ 51. The State's argument fails for several reasons. First, the State has failed to show that the government in fact took steps to obtain P.R.'s statement independently, arguing only that Quigley's immunized statement simply prompted Melichar to reinterview P.R. *sooner rather than later.* The independent source doctrine requires proof that the tainted evidence was *actually* discovered by independent and lawful means; that is, it was "obtained independently from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537 (1988); *see United States v. Markling*, 7 F.3d 1309, 1318 n.1 (7th Cir. 1993) (the independent source doctrine applies when the evidence actually has been discovered by lawful means); *State v. Anker*, 2014 WI App 107, ¶ 25, 357 Wis. 2d 565, 855 N.W.2d 483.

¶ 52. The State's argument misses the mark by arguing what would have happened "later," as compared to what in fact happened. In other words, the issue is not what would have been done, such as would be the case under the inevitable discovery doctrine, but

what was in fact done. *See Markling*, 7 F.3d at 1318 n.1 (the difference between the independent source doctrine and the inevitable discovery doctrine is, under the former, the government must prove what was in fact done, versus what would have been done; reality versus a hypothetical).[12]

¶ 53. Second, the circuit court found it did not know "whether it was true" that the police would have followed up with P.R. Thus, the State has failed to establish as a factual matter that Melichar interviewed P.R. wholly independently of Quigley's immunized statement. In effect, the circuit court concluded that the State failed to meet its burden of proof to show that this actually happened.[13] *Anker*, 357 Wis. 2d 565, ¶ 25.

---

[12] Under the inevitable discovery doctrine, which was not developed by the State, illegally obtained evidence is admissible if the state can show that it " 'inevitably *would have been* discovered by lawful means.' " *State v. Anker*, 2014 WI App 107, ¶ 25, 357 Wis. 2d 565, 855 N.W.2d 483 (quoting *State v. Schwegler*, 170 Wis. 2d 487, 499, 490 N.W.2d 292 (Ct. App. 1992) (emphasis added); *see Murray v. United States*, 487 U.S. 533, 539 (1988). Inevitable discovery requires proof that the state possessed the leads making the discovery inevitable at the time of the misconduct; and that prior to the unlawful search the state also was actively pursuing some alternate line of investigation. *State v. Lopez*, 207 Wis. 2d 413, 427–28, 559 N.W.2d 264 (Ct. App. 1996).

[13] For support, the State relies on *State v. Seiler*, No. 2013AP1911–CR, unpublished slip op. ¶¶ 10–15 (WI App July 23, 2014). Although we have no obligation to distinguish or even discuss this unpublished case, WIS. STAT. § 809.23(3)(b), in *Seiler*, unlike here, there were "sources independent" of the defendant's compelled statement that led to his being charged. There, during the defendant's statement he mentioned that the minor in whose company he was found was the niece of someone with whom he worked, identified as S.S. *Id.*, ¶ 5. However, S.S., on his own accord, had contacted the defen-

¶ 54. And, even if Melichar had stated that he obtained P.R.'s statement wholly independently when he did, five months after Quigley gave his compelled statement, and the court believed him, his subjective intent is simply not enough. *See Nanni*, 59 F.3d at 1432; *Hampton*, 775 F.2d at 1485, 1487 (holding that "conclusory denials of use or derivative use" are insufficient to meet government's burden); *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977) (holding that the "prosecutor's assertion that the immunized testimony was not used is inadequate").

¶ 55. On this point, the decision of the District of Columbia Court of Appeals in *Aiken v. United States*, 30 A.3d 127 (D.C. 2011), provides a useful analogy. There, the defendant was accused of threatening, harassing, and assaulting his girlfriend. *Id.* at 131. Prior to the criminal trial, the girlfriend petitioned for a civil protection order (CPO). *Id.* at 130. A hearing was held during which both the girlfriend and the defendant testified. *Id.* at 131. Under a District of Columbia statute, the defendant's testimony at the hearing was immunized. *Id.* at 132. In attendance at the CPO hearing was the lead investigator on the criminal case against the defendant. *Id.* at 134. After the defendant was convicted and had brought an ineffective assistance of counsel claim based on a *Kastigar* violation, a *Kastigar* hearing was held. *Aiken*, 30 A.3d at 130. During that hearing, the investigator claimed, in short, that nothing that happened at the CPO hearing affected her investigation or prosecution of the defen-

---

dant's probation agent and ultimately told police that the minor had sexual intercourse with the defendant. *Id.*, ¶ 7. Under these circumstances, while the defendant had also mentioned S.S. in his compelled statement, this "did not somehow put S.S. off limits for investigators." *Id.*, ¶ 14.

dant. *Id.* The circuit court credited the investigator's testimony, and the court of appeals did not disturb that finding. *Id.* at 135. Nevertheless, the court of appeals said, the issue was not the investigator's sincerity. *Id.* The issue was whether the government had carried its burden of proof showing that no use was made of the immunized testimony. *Id.* The government could not meet this burden because all it had was the investigator's denials and no other corroborative evidence. *Id.*

¶ 56. Just as in *Aiken*, all that we have here is an assertion from Melichar, that even without Quigley's statement to the DOC, he would have interviewed P.R. again. This is a mere denial that Quigley's statement was used. There is nothing to corroborate Melichar's testimony as to his subjective intent. *Id.* In sum, the government has failed to "document[] or account[] for" "[e]ach step of the investigative chain" by which the evidence was obtained from a legitimate source wholly independent of the compelled statement. *Hampton*, 775 F.2d at 1490.

¶ 57. The State has failed to meet its burden of proof to show the actual existence of a wholly independent, lawful means by which P.R.'s second statement was obtained. *See United States v. Seiffert*, 463 F.2d 1089, 1092 (5th Cir. 1972); *Aiken*, 30 A.3d at 130–31, 134–35.

*Fruits or Evidence Derivative of Quigley's
Compelled Statement*

¶ 58. The circuit court also concluded that P.R.'s statement did not need to be suppressed because the acts Quigley disclosed to his probation agent were different than those that P.R. disclosed during the

reinterview, a point which the State mentions in passing in its brief. This conclusion was erroneous.

¶ 59. The protection provided by the privilege against self-incrimination "is a very broad one." *United States v. Kurzer*, 534 F.2d 511, 516 (2d Cir. 1976). The Fifth Amendment by its very terms is an exclusionary rule. *Id.* The point of the privilege against self-incrimination is to "leave[] the witness . . . in substantially the same position as if the witness had claimed the Fifth Amendment privilege." *Kastigar*, 406 U.S. at 462. The privilege is " 'as broad as the mischief against which it seeks to guard,' and . . . is fulfilled only when a criminal defendant is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty.' " *Hayes*, 365 Wis. 2d 497, ¶ 8 (alteration in original; citation omitted).

¶ 60. In order to place Quigley in that position, the fruit flowing from his statement to the DOC, that being the statement P.R. gave to police during the reinterview, must be suppressed. *See Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 79 (1964) (holding that "a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its *fruits* cannot be used in any manner by federal officials in connection with a criminal prosecution against him." (emphasis added)); *Spaeth*, 343 Wis. 2d 220, ¶ 67 ("The Constitution bars the use of compelled, incriminating testimonial statements and *their fruits* in a subsequent criminal prosecution." (emphasis added)); *Hayes*, 365 Wis. 2d 497, ¶ 9 (explaining that the type of immunity to which a probationer is entitled applies to "statements *or the fruits of statements*")

(alteration in original; citation omitted). It matters not that there was no "nexus" between what Quigley admitted and P.R. alleged. Her statement was the fruit of Quigley's compelled statement. *See Kurzer*, 534 F.2d at 516 (discussing how the Fifth Amendment privilege against self-incrimination requires a broader rule of exclusion than that of the Fourth Amendment); *Spaeth*, 343 Wis. 2d 220, ¶ 64 (rejecting that attenuation doctrine is applicable to compelled, incriminating, testimonial statements).

¶ 61. As for the remedy, the State concedes, and we agree, that the *Kastigar* violation requires us to set aside Quigley's entire plea to both criminal complaints because they were combined into one plea—it was not harmless beyond a reasonable doubt. *See State v. Briggs*, 218 Wis. 2d 61, 73, 579 N.W.2d 783 (Ct. App 1998).

## CONCLUSION

¶ 62. The circuit court correctly concluded that Quigley was not in custody when he gave statements to Melichar. However, it was error for the circuit court not to suppress the statement P.R. made during her reinterview because her statement was derived from the compelled statement Quigley gave to the DOC, and the State did not establish a wholly independent source for her second statement. As a result, Quigley's plea of no contest to both complaints, as the State concedes, must be vacated and the matters remanded to the circuit court.

*By the Court.*—Judgment and order reversed and cause remanded.