PER CURIAM.
¶1 Colin Habram appeals judgments convicting him of maintaining a drug-trafficking place, arson, and intentional mistreatment of animals and an order denying his motion for postconviction relief. We affirm.
¶2 Habram's troubles stem from several cases, two consolidated here for appeal. The first arose after, incident to a search warrant of Habram's residence, police found drugs and drug paraphernalia. He was charged with maintaining a drug-trafficking place, possession of an illegally obtained prescription, and possession of drug paraphernalia, all as a repeater.
¶3 In the second case, Habram called 911 at about 3:30 a.m. saying his house was on fire. He told responding officers that he came home to find a door pried open, his kitchen "slightly trashed" with broken glasses and a bathroom cabinet door on the floor, his bedroom dresser ransacked, and "black, thick, heavy smoke" pouring from a spare bedroom he rented out. Habram denied any involvement and did not suspect the roommate, who was in jail at the time. He suggested other possibilities, however: people who occasionally "crashed" there, armed individuals looking for money, someone who had heard the rumor that he was a "snitch," or a man who allegedly had threatened him and the roommate because the roommate owed the guy money.
¶4 A few hours later, Fond du Lac Police Department Detective Lee Mikulec, who responded to the scene, and Brian Liethen, a special agent assigned to the Office of the State Fire Marshal, contacted Habram. Both Mikulec and Liethen are trained in fire inspection. They asked Habram if he would be willing to come down to the station. The officers granted Habram's request to shower first and came back for him an hour later. Habram then asked to "reschedule," saying he would come to the station the next morning.
¶5 When Habram did not show up, Mikulec attempted to call him but Habram did not answer, so the officers went to the hotel where he was staying. Habram said he overslept. They did not interview him there, as a woman was in the bed and the room had little other furniture where they could sit. He agreed to accompany them to the station and rode with Mikulec.
¶6 Habram was seated in an unlocked interview room. He was not handcuffed or frisked. Liethen told Habram he was "not going to arrest [him] or anything like that," and that Habram could take bathroom or cigarette breaks, although he would be accompanied to smoke so he could get back inside the building. He also was offered food and beverages.
¶7 The total interview lasted just under three hours, most of it gathering factual information such as the timeline of events, the layout of the house and its contents, and Habram's home ownership and insurance coverage. Mikulec testified that the overall tone was "extremely mellow" and conversational.
¶8 About eighty minutes in, Habram asked, "I don't mean to sound rude or anything, but do you know how much longer we'll be?" Liethen responded, "I don't think we'll be too much longer." After another twenty minutes, Liethen said he needed "two seconds" to speak to Mikulec on another case "and we'll be right back in." Habram asked, "Am I good to go then or what?" Liethen replied, "I don't think you'll be much longer here. We'll get you right back." Habram said he could walk back to the hotel, as it was "not far" from the station.
¶9 In the last approximately forty minutes, the tone changed. Liethen told Habram he did not believe Habram's story because, based on the fire specialists' many-hours inspection of the scene, he believed the fire was deliberately set and that the evidence pointed only to Habram. Habram at first denied it, but ultimately admitted that, depressed over his heroin addiction, precarious financial situation, and a failed love relationship, he decided to end his life, and set the fire using lighter fluid as an accelerant. His dog and cat perished. After signing a written statement, Habram was allowed to leave the police station. At no point was Habram given warnings required by Miranda v. Arizona , 384 U.S. 436 (1966).
¶10 Habram was arrested the next day. He was charged with arson of a building, arson of a building with intent to defraud, first-degree recklessly endangering safety of police and fire personnel, and intentionally mistreating animals, all with the repeater enhancer. He faced over 123 years' imprisonment. Pursuant to a plea agreement, Habram pled no contest to the arson, animal mistreatment, and drug-trafficking-place charges, cutting his exposure to fifty-five years and six months. The remaining charges were dismissed and read in, as were charges from four other cases not part of this appeal. He was sentenced to an aggregate twenty-seven years' imprisonment.
¶11 Postconviction, Habram moved to withdraw his no-contest plea on grounds of ineffective assistance of counsel. He contended defense counsel, Jeffrey Haase, failed to move to suppress his confession to police before he decided to plead, and that the motion would have been successful, as Mikulec and Liethen subjected him to custodial interrogation without Miranda warnings.
¶12 At the hearing on the postconviction motion, Haase testified that he reviewed the recording of Habram's police-station interview, that he was aware that Habram had not received Miranda warnings, and that whether to seek the statement's suppression was one of the first issues he considered. He testified that he discussed with Habram the possibility of seeking to suppress it on both involuntariness, due to heroin intoxication, and Miranda grounds and that he told Habram the Miranda claim was the stronger argument.
¶13 Haase testified that he and Habram discussed the State's plea offer at least four or five times. Habram was disappointed a proposal to send him to drug court was rejected but his main dissatisfaction was the lack of a sentencing cap. As the prosecutor repeatedly refused to make a better offer, Haase said he feared that, in his experience with the particular prosecutor, requiring the State to litigate a suppression motion could result in withdrawal of the offer. Haase acknowledged to Habram that, because the plea deal meant pleading to some "very serious charges," it "isn't a great offer, but this is ... what we're getting." Noting that the State's offer reduced Habram's sentencing exposure by about seventy years, Haase said he explained the risk of being convicted of all the charged offenses at trial but whether to plead was solely Habram's decision and Haase would have abided by it.
¶14 Contrary to Haase's testimony, Habram testified that Haase did not discuss with him the option of moving to suppress his arson confession based on a Miranda violation. He said the motion-suppression discussions were limited to the ground of voluntariness (intoxication) because he was getting "dope sick" toward the end of the interview. He said he resigned himself to accepting the State's offer despite no sentencing cap and gaining only dismissal of some charges because Haase convinced him that the intoxication argument was almost certain to fail and never discussed raising a Miranda violation. Habram testified that he believed he would have prevailed on a Miranda -based motion, thus preventing the State from using his confession in its case-in-chief, and argues here there is a "reasonable probability" that he would have gone to trial.
¶15 The circuit court concluded that Habram was not in custody during the interview, finding that most of the questioning was "relatively benign, informational," that Habram's "vague and nebulous" queries about the length of the interview were not requests to terminate it, and that a reasonable person in similar circumstances would have felt free to leave.
¶16 The court also found that Haase discussed with Habram a motion to suppress the confession based on a Miranda violation and that the motion would not have succeeded, such that not pursuing that tack was a reasonable strategy, not deficient performance. It further found that Habram was not prejudiced because the hope that a suppression motion would have pressed the State to make a better plea offer was "really quite speculative" and his overall sentence exposure was markedly reduced by accepting the deal he did. The court thus concluded that Habram failed to prove that Haase was ineffective. This appeal followed.
¶17 To withdraw a plea post-sentencing, a defendant must establish by clear and convincing evidence that plea withdrawal is necessary to correct a manifest injustice. State v. LeMere , 2016 WI 41, ¶22, 368 Wis. 2d 624, 879 N.W.2d 580. "Ineffective assistance of counsel is one type of manifest injustice." Id. , ¶23 (citation omitted). Whether defense counsel provided ineffective assistance presents a mixed question of fact and law. Id. We will uphold the circuit court's factual findings unless they are clearly erroneous, but we review de novo the legal question of whether counsel's performance satisfies the constitutional standard for ineffective assistance of counsel. Id.
¶18 To prevail on an ineffective-assistance claim, the defendant must show that counsel's representation fell below an objective standard of reasonableness, Strickland v. Washington , 466 U.S. 668, 688 (1984), and that a reasonable probability exists that, but for those unprofessional errors, the result of the proceeding would have been different, id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
¶19 Habram contends his arson confession was the result of an un-Mirandized custodial interrogation and counsel therefore was ineffective for not pursuing a motion to suppress his statement.
¶20 Miranda warnings are required only in the context of a custodial interrogation. State v. Armstrong , 223 Wis. 2d 331, 344-45, 588 N.W.2d 606 (1999). It is undisputed they were not given. The question, therefore, is whether Habram was in custody.
¶21 In determining whether an individual was "in custody" for Miranda purposes, we consider the totality of the circumstances, including the individual's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint. State v. Gruen , 218 Wis. 2d 581, 594, 582 N.W.2d 728 (Ct. App. 1998). Degree-of-restraint factors include whether: the individual was handcuffed or otherwise restrained; a weapon was drawn; a frisk was performed; the individual was moved to another location; questioning took place in a police vehicle; and multiple officers were involved. Id. at 594-96. A person is in custody if a reasonable person in the same circumstances "would not feel free to terminate the interview and leave the scene." State v. Lonkoski , 2013 WI 30, ¶6, 346 Wis. 2d 523, 828 N.W.2d 552. "[T]he ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id. (citation omitted). The test is an objective one, and is not determined by the subjective views of the officers or the person being questioned. State v. Quigley , 2016 WI App 53, ¶¶33, 42, 370 Wis. 2d 702, 883 N.W.2d 139.
¶22 Habram's interview at the police station "may weigh toward the encounter being custodial, but that fact is not dispositive." Lonkoski , 346 Wis. 2d 523, ¶28. Habram had offered to come to the station but, when he did not show or answer his phone, the officers went to him. The hotel room being an unsuitable interview site, Habram voluntarily rode with Mikulec to the police station.
¶23 The interview room door there was closed but not locked. Habram was not frisked, handcuffed, or otherwise restrained, and was allowed four breaks. One outdoor cigarette break was unaccompanied. Liethen told him at the outset and, again later, that he was not arrested. Two officers were involved, each with distinct expertise in fire investigations. There is no claim that either brandished a weapon or became threatening. When Habram asked "how much longer" it might be or when he would be "good to go," Liethen answered that it should not be "too much longer," and that they would "get [him] right back" to the hotel.
¶24 As the circuit court found, Habram's queries were not affirmative demands to stop the questioning and Liethen's responses in no way said Habram was not free to leave. The roughly three-hour interview was not "excessively long." The bulk of it was conversational information gathering necessary to a fire investigation. Even after the tone turned accusatory and Habram gave his statement, he was not arrested. Instead, Mikulec offered to "help you out today ... if we took you to the hospital to try to ... help you get rid of this dope sick right now." When Habram declined, they drove him back to his hotel.
¶25 There was no restraint on Habram's freedom of movement of the degree associated with a formal arrest. Id. , ¶6. We agree that, under the totality of the circumstances, Habram was not in custody during the interview. Counsel's performance is not deficient if he or she fails to raise a meritless issue. State v. Wheat , 2002 WI App 153, ¶14, 256 Wis. 2d 270, 647 N.W.2d 441.
¶26 Habram nonetheless argues that Haase's decision not to file the suppression motion based on Miranda was not reasonable. He insists there was a "substantial probability" that his damaging confession would have been suppressed and that, as a practical matter, the State's offer gave him "nothing in return for waiving all of his constitutional rights." He downplays Haase's claimed fear that the State would yank the offer to dismiss other counts if he pursued the motion. Habram suggests Haase's fear was illogical because, even with the deal, he faced fifty-five years, virtually a life sentence. He also asserts that, while the decision to plead or not technically and legally may be solely his choice, in actuality, "the responsibility for not filing it falls entirely upon counsel."
¶27 Haase testified that he explained to Habram that even a successful suppression motion based on Miranda would not necessarily have kept the confession from the jury. See State v. Mendoza , 96 Wis. 2d 106, 118-19, 291 N.W.2d 478 (1980) (voluntary statement made in violation of Miranda inadmissible in State's case-in-chief but may be used for impeachment purposes). He also testified that he evaluated the strength of the State's case and concluded that it had evidence sufficient to prove the arson charge even without Habram's confession. For example, Habram's friend who dropped him off at home when he claimed to find his house broken into, "trashed," and thick with smoke, came inside with him for fifteen or twenty minutes and saw no disarray or broken glass and smelled no smoke. Another friend told police that Habram talked to her several times about burning his house down just days before the fire. The fire marshal's report indicated that Habram's bedroom and its contents were more destroyed by fire, in contrast to Habram's claim that the fire was concentrated in the roommate's bedroom. Haase also explained to Habram that going to trial would take the State's offer off the table, and posed the risk of being convicted of all the charged offenses, vastly increasing his sentence exposure.
¶28 The circuit court found that Haase discussed the motion with Habram multiple times, attempted to persuade the State to improve its offer, and explained to Habram that, even if excluded under Miranda , the confession still could be used for impeachment purposes at trial. The court evidently found Haase's testimony that he discussed a Miranda -based motion with Habram more credible than Habram's testimony that Haase did not. The court thus concluded that Haase had a strategic reason for advising against filing a suppression motion and that the decision was rationally based on the facts and law.
¶29 Our role on appeal is not to second-guess counsel's selection of strategies or the exercise of professional judgment after weighing the alternatives. See State v. Felton , 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983). Not only do we afford counsel's performance great deference and avoid determinations based on hindsight, we also accept a circuit court's conclusions that are based on its credibility findings, implicit or otherwise. State v. Quarzenski , 2007 WI App 212, ¶23, 305 Wis. 2d 525, 739 N.W.2d 844.
¶30 Even assuming Haase should have filed the motion, Habram has not carried his burden of affirmatively proving prejudice from Haase's failure to do so. "Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense." Strickland , 466 U.S. at 693.
¶31 Habram testified that knowing there was a strong basis to suppress his statement "[m]ost definitely" would have impacted his pleading decision because if the motion to suppress was successful, "there's a possibility " that he would have gone to trial. "A possibility" is far from affirmative proof of prejudice, however, given the significant other evidence against him, the substantial added prison exposure, and the fact that only he could have testified to his I-didn't-do-it version of the fire incident, in which case the confession could be used anyway. Habram also testified to a hope that the district attorney's office might have made a better offer if the confession were suppressed.
¶32 A showing of prejudice requires more than speculation; the defendant must affirmatively prove prejudice. State v. Wirts , 176 Wis. 2d 174, 187, 500 N.W.2d 317 (Ct. App. 1993). Because the circuit court's findings are not clearly erroneous and because Habram has failed to establish that he was prejudiced by any of the claimed deficiencies on the part of his defense counsel, we affirm the judgments and order.
By the Court .-Judgments and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.